THE WESTON FIRM

GREGORY S. WESTON (239944)
*greg@westonfirm.com*
ANDREW C. HAMILTON (299877)
*andrew@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:     (619) 798-2006
Facsimile:      (619) 343-2789

**Counsel for Plaintiff**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK BEASLEY, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CONAGRA BRANDS, INC., <br><br> Defendant. | Case No:_____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** <br><br> **CAL. BUS. & PROF. CODE §§17200** *et seq.*; <br><br> **CAL. BUS. & PROF. CODE §§17500** *et seq.*; and <br><br> **BREACH OF EXPRESS AND IMPLIED WARRANTIES** |

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ................................................................................. 1

II.     INTRADISTRICT ASSIGNMENT ........................................................................... 1

III.    NATURE OF THE ACTION .................................................................................... 1

IV.     PARTIES .................................................................................................................. 2

V.      NATURE OF TRANS FAT ...................................................................................... 3

VI.     PLAINTIFF'S PURCHASES OF CRUNCH 'N MUNCH ...................................... 11

VII.    CRUNCH 'N MUNCH'S "0g Trans Fat" CLAIM WAS FALSE, MISLEADING AND
        AN UNLAWFUL NUTRIENT CONTENT CLAIM ................................................ 12

VIII.   CRUNCH 'N MUNCH UNNECESSARILY CONTAINED PHO AND TRANS FAT. ............ 14

IX.     DEFENDANT'S PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE
        CALIFORNIA UNFAIR COMPETITION LAW. .................................................... 14

X.      DEFENDANT'S PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF
        THE CALIFORNIA UNFAIR COMPETITION LAW. ............................................ 15

XI.     RELIANCE AND INJURY ...................................................................................... 16

XII.    DELAYED DISCOVERY ........................................................................................ 17

XIII.   CLASS ACTION ALLEGATIONS ......................................................................... 18

CAUSES OF ACTION ...................................................................................................... 19

XIV.    PRAYER FOR RELIEF ........................................................................................... 26

XV.     NO JURY DEMAND ............................................................................................... 27

I.      Appendix A: List of Popcorn Snacks Free of Trans Fat ............................................. 28

Plaintiff Mark Beasley, on behalf of himself, all others similarly situated, and the general public, by and through his undersigned counsel, hereby sues Defendant ConAgra Brands, Inc. ("ConAgra" or "Defendant"), and upon information and belief and investigation of counsel, alleges as follows:

## I.   JURISDICTION AND VENUE

1.   The Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and because more than two-thirds of the members of the class defined herein reside in states other than the state of which ConAgra resides.

2.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Mark Beasley suffered injuries as a result of ConAgra's acts in this District, many of the acts and transactions giving rise to this action occurred in this District and ConAgra: (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District through the distribution and sale of its products in this District; and (2) is subject to personal jurisdiction in this District.

## II.   INTRADISTRICT ASSIGNMENT

3.   This civil action arises in part out of the acts and omissions of Defendant ConAgra Brands, Inc., which occurred in San Francisco and San Mateo Counties, California. Pursuant to Civil Local Rule 3-2(c), this action should be assigned to the San Francisco or the Oakland Division.

## III.   NATURE OF THE ACTION

4.   ConAgra manufactured, marketed, and sold caramel popcorn snacks containing partially hydrogenated oil ("PHO") under the brand name Crunch 'n Munch (collectively "Crunch 'n Munch"). Unless otherwise stated, references to Crunch 'n Munch only include Crunch 'n Munch during the period it contained PHO.

5.   PHO is a food additive banned in many parts of the world due to its artificial trans fat content. Artificial trans fat is a toxic carcinogen for which there are many safe and commercially viable substitutes.

6.      On June 16, 2015, the FDA issued a final regulation and declaratory order, after extensive public comment, declaring PHO unsafe for any use in food.[1] The FDA came to the same conclusion when it initially proposed the regulation in 2013.

7.      Defendant was aware that PHO was unsafe even before this time, yet still harmed its customers by adding PHO to Crunch 'n Munch.

8.      During the entire class period, inexpensive and commercially viable alternatives to PHO existed, and were used in many competitor products. A list of such products is identified in Appendix A hereto. In order to increase profits, Defendant instead sold an unsafe and illegal product, and such behavior was an unfair business practice.

9.      For much of the class period, Defendant also defrauded the class by using the false and unauthorized "0g Trans Fat" nutrient content claim on Crunch 'n Munch packaging. All PHO, however, contains trans fat, and the amount in Crunch 'n Munch was not "0g," but a substantial and dangerous amount.

10.     Plaintiff purchased and consumed Crunch 'n Munch during the Class Period defined herein.

11.     This action is brought to remedy ConAgra's unfair, deceptive, immoral and unlawful conduct. On behalf of the class defined herein, Plaintiff seeks an order compelling ConAgra to, *inter alia*: (1) destroy all misleading and deceptive materials and products; (2) forever refrain from using artificial trans fat as an ingredient in Crunch 'n Munch; (3) award Plaintiff and the Class restitution; and (4) pay costs, expenses, and reasonable attorney fees.

## IV.   PARTIES

12.     Defendant ConAgra is a Delaware corporation with its principal place of business in Chicago, Illinois.

13.     Plaintiff Mark Beasley is a citizen of California who repeatedly purchased Crunch 'n Munch for personal and household consumption.

---

[1] 80 Fed. Reg. 34650 (June 17, 2015) (hereinafter "FDA Final Determination").

CLASS ACTION COMPLAINT

## V. NATURE OF TRANS FAT

14. Artificial trans fat is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400°F in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[2] The resulting product is known as partially hydrogenated oil, or PHO.

15. PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHO molecules chemically differ from the natural fat molecules in other food products.[3]

16. Natural fat, except the trace amounts of natural trans fat from ruminant animal sources like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds. Trans fat, in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon chain.



17. PHO was initially a "wonder product" attractive to the processed food industry because it combined the low cost of unsaturated cis fat with the flexibility and long shelf life of saturated fat. Like processed cis fat, PHO is manufactured from low-cost legumes,[4] while saturated fat is derived from relatively expensive animal and tropical plant sources.[5]

18. As detailed herein, PHO causes cardiovascular disease, diabetes, cancer, Alzheimer's disease, and accelerates memory damage and cognitive decline. These risks were well known during

---

[2] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[3] *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Trans Fats*, Scientific American, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited October 22, 2018).

[4] e.g., corn oil, cottonseed oil, soybean oil, peanut oil

[5] e.g., butter, cream, tallow, palm oil, coconut oil

the entire class period, and at no point during the class period was there ever a consensus that PHO was safe to use, neither in general nor as an ingredient in coffee creamer.

      **A.**    **There is a Well-Established Scientific Consensus That Trans Fat is Extremely Harmful.**

19.    The National Academies of Science were charted by an act of Congress, signed by President Lincoln in 1863. Under that charter, in 1970, the National Academy of Medicine was created. In a 2005 report, under its former name of the Institute of Medicine, it issued a report finding there was "no safe level" of PHO or artificial trans fat intake.[6] Therefore, in 2005, there was no consensus that PHO was a safe ingredient to use in food. To the contrary, the consensus was that it is unsafe.

20.    In addition, "trans fatty acids are not essential and provide no known benefit to human health."[7] Thus, while IOM provided safe maximum levels for other food elements like saturated fat, in could not and declined to provide one for trans fat when requested by the FDA, the reason being that "**any** incremental increase in trans fatty acid intake increases the risk of CHD."[8] (emphasis added).

21.    In 2006, Dariush Mozaffarian of Harvard Medical School wrote in the New England Journal of Medicine, "the consumption of trans fatty acids results in considerable potential harm but no apparent benefit."[9]

22.    Julie Louise Gerberding, who served eight years as the head of the United States Centers for Disease Control and Prevention, wrote in 2009:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in

---

[6] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

[7] Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease; Proposed Rule, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[8] *Id.*

[9] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601, 1608-1609 (2006).

increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium. The strong evidence of harm… Eliminating exposure to these dangerous fats could have a powerful population impact— potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[10]

23.     Dr. Mozaffarian further writes:

Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention.[11]

24.     In 2011, Walter Willet, also a professor at Harvard Medical School, described Defendant's behavior of selling food made with PHO as "a food safety issue . . . this is actually contamination."[12]

25.     The views of these experts, and many others, show that, even before the FDA formally declared PHO to be unsafe for use in food in 2015, its use was still unlawful because there was not a consensus of scientific experts that PHO was a safe food additive.

**B.     The PHO in Crunch 'n Munch Caused Coronary Heart Disease.**

26.     Trans fat raises the risk of CHD more than any other known consumed substance.[13]

27.     A 1999 estimate published in the New England Journal of Medicine found that removing PHO from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[14]

---

[10] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-138 (2009).

[11] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601 (2006).

[12] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

[13] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

[14] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999).

28.     By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including vasodilation, coronary artery disease, and primary cardiac arrest.

29.     In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[15]

30.     The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[16]

31.     Even further back, in 2003, a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

> [B]ased on the consistent results across a number of the most persuasive types of study designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations . . . the available evidence for an adverse relationship between trans fat intake and CHD risk is strong.[17]

32.     The FDA concluded in 2010 that "there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]." 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD." *Id.*

33.     A study published in American Heart Association's *Circulation* found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after

---

[15] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[16] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited October 22, 2018).

[17] FDA, Final Rule, 68 Fed. Reg. 41433, 41445 (July 11, 2003).

CLASS ACTION COMPLAINT

controlling for a variety of medical and lifestyle risk factors.[18]

34.     Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue (stored body fat) compared to controls. The effects of consuming trans fat are therefore shown to be long-lived because of its storage within the body in place of natural fats.[19]

35.     Cholesterol dysregulation and systemic inflammation/immune system dysregulation are the most important pathways through which PHO consumption causes morbidity and death. Another route is by promoting atherosclerosis by degrading the function of TGF-β, a protein responsible for preventing the development of atherosclerotic lesions.[20]

36.     TGF-β also functions to suppress cancerous tumors. Degradation of TGF-β function is also likely one route by which artificial trans fat consumption promotes cancers in fatty organs and the digestive system.[21]

**C.     The PHO in Crunch 'n Munch Caused Type-2 Diabetes.**

37.     Artificial trans fat also causes type-2 diabetes.[22]

38.     In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to misform and malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

39.     Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating PHO for only four weeks.[23]

---

[18] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

[19] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. NUTR. 874, 874-79 (2004).

[20] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

[21] *Id.*

[22] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited October 22, 2018).

[23] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

40.     By the eighth week of the study, mice fed the high trans fat diet showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body.[24]

41.     A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[25]

**D.      The PHO in Crunch 'n Munch Caused Breast, Prostate, and Colorectal Cancer.**

42.     Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

43.     A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[26]

44.     In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the lowest quintile.[27]

45.     A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[28]

46.     A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[29]

47.     A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-

---

[24] *Id.*

[25] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[26] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study.* 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

[27] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[28] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[29] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[30]

### E.     The PHO in Crunch 'n Munch Caused Alzheimer's Disease and Cognitive Decline.

48.     Trans fat causes Alzheimer's disease and cognitive decline.

49.     In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[31]

50.     The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat."[32]

51.     In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . . trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[33]

52.     The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes."[34] (citations omitted).

53.     Artificial trans fat also damages the brains of those who consume it. A study conducted by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be strongly correlated with impaired memory.[35] The authors of the study, appearing in *Circulation*, the American Heart Association's peer-reviewed journal, conclude that "Greater dTFA [dietary trans fatty

---

[30] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[31] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

[32] *Id.*

[33] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

[34] *Id.*

[35] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, CIRCULATION. 130:A15572 (2014).

acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical years for career building."

54.    Performing a word memory test, each additional gram per day of trans fat consumed was associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat consumption damages memory ability. The young men with the highest trans fat consumption scored 12 fewer recalled words on the 104-word test.[36]

**F.    The PHO in Crunch 'n Munch Caused Organ Damage.**

55.    Artificial trans fat molecules are readily incorporated into blood and organ cells in place of natural fat molecules, which damages vital organs, including the heart, brain, and reproductive system. Further, changing the chemical composition of cells induces systemic inflammation, where the immune system fails to recognize such cells as native to the body and becomes persistently overactive, leading to further organ damage.[37]

**G.    PHO Use is Unlawful in California, the United States, and European Nations.**

56.    New York City banned trans fat in restaurants in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

57.    A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial trans fat, a test that Crunch 'n Munch did not meet during the class period.

58.    A study of Denmark's 2004 trans fat ban concluded it "did not appreciably affect the

---

[36] *Id.*

[37] *See*:

Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction,* 135 J. NUTR. 562-66 (2005);

Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study,* 79 AM. J. CLIN. NUTR. 969-73 (2004);

Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with othis fats and oils,* 63 EURO. J. CLIN. NUTR. S22-33 (2009);

Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure* 80 AM. J. CLIN. NUTR. 1521-25 (2004).

quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[38]

59.  These laws were all motivated by the strong evidence trans fat is dangerous, showing there was not a scientific consensus during the class period that PHO was a safe food additive.

60.  On June 17, 2015, the FDA released a declaratory order which it called its Final Determination Regarding Partially Hydrogenated Oils, finding that "PHOs are not GRAS for any use in human food." 80 Fed. Reg. 34650, 34651 (June 17, 2015) ("Final Determination")

61.  The FDA's Final Determination noted that "if there are data and information that demonstrates to a reasonable certainty that no harm will result from a specific use of a PHO in food, that information could be submitted as part of a food additive petition to FDA seeking issuance of a regulation to prescribe conditions under which the additive may be safely used in food." Final Determination at 34664.

62.  On June 11, 2015 and March 7, 2017, the Grocery Manufacturers Association ("GMA") submitted such a food additive petition and then an amended petition seeking approval to use partially hydrogenated oil in "approximately 60 food categories," including coffee creamers. On May 21, 2018, the FDA denied the amended GMA petition, and stated it considered the first one abandoned. In doing so, the FDA rejected the GMA's argument for a "non-linear dose response" model and noted that "the vast majority of scientific studies have been consistent in their conclusions that trans fat consumption has a progressive and linear adverse effect on blood lipids and CHD risk." Denial of Food Additive Petition, 83 Fed. Reg. 23382, 23390 (May 21, 2018).

## VI.   PLAINTIFF'S PURCHASES OF CRUNCH 'N MUNCH

63.  Plaintiff Mark Beasley regularly purchased Crunch 'n Munch during the Class Period.

64.  Mr. Beasley purchased Crunch n Munch from San Francisco and San Mateo grocery stores.

---

[38] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans Fat in Popular Fast Food*, 354 NEW ENG. J. MED. 1650, 1652 (2006).

65.     Plaintiff first discovered Defendant's unlawful acts described herein in October 2018, when he learned that Crunch 'n Munch contained an unsafe food additive for years and was fraudulently marketed.

66.     Plaintiff, in the exercise of reasonable diligence, could not have discovered earlier Defendant's fraudulent and unlawful acts. Plaintiff is not a nutritionist, food expert, or food scientist, but rather a lay consumer who did not have the specialized human nutrition knowledge of Defendant, nor is Plaintiff, like Defendant, charged with compliance with state and federal food safety laws.

67.     Plaintiff relied on ConAgra's "0g Trans Fat" claim as a substantial factor in some of his purchases of Crunch 'n Munch.

## VII.    CRUNCH 'N MUNCH'S "0g Trans Fat" CLAIM WAS FALSE, MISLEADING AND AN UNLAWFUL NUTRIENT CONTENT CLAIM

68.     During much of the Class Period, Crunch 'n Munch was made with PHO yet contained the deceptive health and wellness claim "0g Trans Fat Per Serving" prominently displayed on the front of the box.




12

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22



23   69.    This language was part of an intentional, long-term campaign to deceptively market

24   Crunch 'n Munch as healthful and free of trans fat.

25   70.    ConAgra's conduct is especially egregious many of the competitor products are and

26   were free of PHO and do not pose the serious health consequences associated with Crunch 'n Munch

27   (see Appendix A for list of competitor products).

28   71.    "0g Trans Fat" is an unauthorized nutrient content claim.

13

**VIII.    CRUNCH 'N MUNCH UNNECESSARILY CONTAINED PHO AND TRANS FAT.**

72.    ConAgra's use of PHO in Crunch 'n Munch was always unnecessary. There are several safe substitutes for PHO and artificial trans fat. Indeed, ConAgra now uses non-hydrogenated "soybean" and "canola oil," neither of which contain trans fat, as a substitute for PHO in the current formulation.

73.    Crunch 'n Munch was made with PHO even as competing popcorn products did not engage in this unfair and unlawful conduct. During the class period, brands of popcorn without PHO included Cracker Jack, LesserEvil, Skinny Pop, Poppycock, and Fiddle Faddle (see Appendix A for full list).

**IX.    DEFENDANT'S PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW.**

74.    Defendant's practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because its conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of this conduct to Defendant does not outweigh the gravity of the harm to Defendant's victims.

75.    Plaintiff's claims for unfair business practices are independent of his claim for false advertising. Even absent the unlawful and deceptive 0g Trans Fat claim, the sale of Crunch 'n Munch violated the UCL and the implied warranty of merchantability.

76.    In particular, while the unlawful sale of Crunch 'n Munch may have had some utility to Defendant in the form of increased profits, this utility was small and far outweighed by the gravity of the serious health harm ConAgra inflicted on consumers.

77.    Defendant's conduct injured competing manufacturers and sellers of popcorn that do not engage in its unfair behavior, especially given ConAgra's large market share, large market power, and limited retail shelf space.

78.    Moreover, Defendant's practices violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including the California Health & Safety Code § 114377 and California Education Code § 49431.7.

79.    Defendant's actions also violated public policy by causing the United States and

14

California to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies, veterans' health programs, public employee and retiree health insurance—for treatment of trans fat-related illnesses.

80.     Further, the injury to consumers from Defendant's practices is substantial, not outweighed by benefits to consumers or competition, and not an injury consumers themselves could reasonably have avoided.

81.     The unfairness of Defendant ConAgra's conduct is also illustrated by, *inter alia*:

- Many of ConAgra's competitors have long made their popcorn and snack products without adding trans fat;

- Many other smaller brands, even cheaper store brands, are also made without adding trans fat;

- Peer-reviewed studies published in scholarly public health journals have repeatedly found that the removal of trans fat does not affect the price or availability of any food;

- The State of California has made legislative findings that artificial trans fat is a dangerous hazard to public health;

- The FDA has found the partially hydrogenated oil used in Crunch 'n Munch to not be Generally Recognized as Safe;

- Doctors' associations such as the American Heart Association, and learned societies such as the National Academies of Science, found that the addition of trans fat to the American diet by causing tens of thousands excess deaths per year, and worked to publicize these findings. ConAgra was well aware of these dangers, but choose not to follow its food industry peers in immediately removing trans fat from its products.

## X.     DEFENDANT'S PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW.

82.     The PHO used in Crunch 'n Munch appears nowhere on the FDA's list of the hundreds of substances it considers GRAS.[39]

83.     PHO also fails to meet the fundamental requirement for GRAS status—that the

---

[39] *See* 21 C.F.R. §§ 181, 182, 184 and 186.

substance is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans fat consumption.

84.     Under the Food Additives Amendment of 1958, which amended the FDCA, all food additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food additive, or (2) their use is pursuant to FDA approval. Because the PHO used in Crunch 'n Munch does not meet either of these exceptions, they are, and long have been, unsafe and unlawful for use in food.

85.     Defendant's practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because PHO is not Generally Recognized as Safe (GRAS). Therefore, the PHO in Crunch 'n Munch rendered it adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C).

86.     At no point during the class period was there a scientific consensus PHO was safe. Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

## XI.   RELIANCE AND INJURY

87.     When purchasing Crunch 'n Munch, Plaintiff was seeking a product made with safe and lawful ingredients.

88.     Plaintiff lost money because of Defendant's conduct because he purchased products that were detrimental to his health and were unfairly and unlawfully offered for sale in violation of federal and California law. Had Defendant not violated the law, Plaintiff would not have been able to purchase Crunch 'n Munch.

89.     Plaintiff suffered physical injury when he repeatedly consumed Crunch 'n Munch, because consuming artificial trans fat in *any* quantity, including the quantity he actually consumed, inflames and damages vital organs and increases the risk of heart disease, diabetes, cancer, and death.

90.     Reasonable consumers in California, including Plaintiff, expect food sold in grocery stores to be fit for human consumption, not unlawful foods that are adulterated under California and federal law. During the class period, Crunch 'n Munch was not fit for human consumption and had a value of $0.

91.     Plaintiff, on at least one occasion, would not have purchased Crunch 'n Munch absent Defendant's 0g Trans Fat misrepresentation, and never would have purchased it had he known it was unlawful and adulterated.

92.     Plaintiff lost money as a result of Defendant's unlawful behavior. Plaintiff altered his position to his detriment and suffered loss in an amount equal to the amount he paid for Crunch 'n Munch.

## XII.   DELAYED DISCOVERY

93.     Plaintiff did not discover that Defendant's behavior was unfair and unlawful and ConAgra's labeling was false, deceptive or misleading until October 2018, when he learned that Crunch 'n Munch contained, despite its explicit label claim, trans fat, and that trans fat is harmful to human health in any quantity because it causes heart disease, diabetes, and cancer. Until that time, he lacked the knowledge regarding the facts of his claims against Defendant.

94.     Plaintiff is a reasonably diligent consumer who exercised reasonable diligence in his purchase, use, and consumption of Crunch 'n Munch. Nevertheless, he would not have been able to discover Defendant's deceptive practices and lacked the means to discover them given that, like nearly all consumers, he is not an expert on nutrition and does not typically read or have ready access to scholarly journals such as The Journal of Nutrition,[40] The European Journal of Clinical Nutrition,[41] and The New England Journal of Medicine,[42] where the scientific evidence of artificial trans fat's dangers has been published. Furthermore, ConAgra's labeling practices—in particular, representing for many years that Crunch 'n Munch has "0g Trans Fat"—actively impeded Plaintiff's and Class members' abilities to discover the dangerous effects of Crunch 'n Munch throughout the Class Period.

---

[40] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. Nutr. 874, 874-79 (2004).

[41] A. Tavani et al., *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*, 51 Eur. J. Clin. Nutr. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, hertory of hypertension and hyperlipidemia").

[42] Mozaffarian, 354 New Eng. J. Med. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

CLASS ACTION COMPLAINT

# XIII.   CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this action on behalf of himself and all others similarly situated (the "Class"), excluding Defendant's officers, directors, and employees, and the Court, its officers and their families.

96.    The Class is defined as follows:

All citizens of California who purchased in California, on or after January 1, 2010, Crunch 'n Munch products containing partially hydrogenated oil.

Plaintiff also defines a the **0g Trans Fat Claim Subclass** as follows:

All citizens of California who purchased in California, on or after January 1, 2010, Crunch 'n Munch containing the nutrient content claim "0g Trans Fat" and containing partially hydrogenated oil.

97.    Questions of law and fact common to Plaintiff and the Class include:

a.    Whether Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

b.    Whether the slight utility Defendant realizes as a result of its conduct outweighs the gravity of the harm the conduct causes to its victims;

c.    Whether Defendant's conduct violates public policy as declared by specific constitutional, statutory, or regulatory provisions;

d.    Whether the injury to consumers from Defendant's practices is substantial;

e.    Whether the injury to consumers from Defendant's practices is one consumers themselves could reasonably have avoided;

f.    Whether Crunch 'n Munch communicated a misleading health and wellness message and made an unauthorized nutrient content claim through its "0g Trans Fat" claim;

g.    Whether that message was material to a reasonable consumer;

h.    Whether Defendant's conduct constitutes violations of California's False Advertising Law;

i.    Whether members of the Class are entitled to restitution and, if so, the measure of restitution

18

j.   Whether members of the Class are entitled to prejudgment interest, and how that interest is to be calculated;

k.   Whether members of the Class are entitled to any further relief.

98.   Plaintiff's claims are typical of Class members' claims because all Class members were subjected to the same unlawful, unfair, and deceptive conduct when they purchased Crunch 'n Munch and suffered the same economic injury.

99.   Absent Defendant's material deceptions, misstatements, and omissions, and Defendant's unlawful sale, distribution, and marketing of Crunch 'n Munch, Plaintiff and other Class members would not have purchased Crunch 'n Munch

100.   The Class is sufficiently numerous, as it includes thousands of individuals who purchased Crunch 'n Munch throughout California during the Class Period.

101.   Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as two dollars for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

102.   Questions of law and fact common to the Class predominate over any questions affecting only individual members.

103.   Class treatment is appropriate under Civ. Code § 382. Plaintiff will, if notice is required, confer with Defendant and seek to present the Court with a stipulation and proposed order on the details of a class notice plan.

## **CAUSES OF ACTION**

### **First Cause of Action**

### **Unfair Competition Law, Bus. & Prof. Code §§ 17200** *et seq.*

104.   In this and every cause of action, Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

### **Unfair Conduct**

105.   The business practices and omissions of Defendant as alleged herein constitute "unfair" business acts and practices in that Defendant's conduct is immoral, unethical, unscrupulous, and

19

substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to Defendant's victims.

106.    Further, Defendant's practices are unfair because they violate public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA, California Health and Safety Code, and California Education Code.

107.    Further, Defendant's practices are unfair because the injury to consumers from Defendant's practices is substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided or should be obligated to avoid.

108.    Plaintiff also seeks an order for the disgorgement and restitution of all revenue received by Defendant's from the sale of Crunch 'n Munch

**Unlawful Conduct**

109.    Defendant's have made and distributed, in interstate commerce and in this county, products that contain unlawful food additives. Crunch 'n Munch was placed into interstate commerce by Defendant.

110.    Defendant's conduct is "unlawful" because it violates the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food additive unsafe unless it has met two exceptions, neither of which the PHO used in Crunch 'n Munch has met. 21 U.S.C. §§ 348, 342.

111.    Defendant's conduct further violates The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Health & Safety Code § 110100, which adopts all FDA regulations as state regulations. Defendant's conduct also violates the following sections of the Sherman Law:

    • § 110100 (adopting all FDA regulations as state regulations);

    • § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

112.    The use of artificial trans fat in Crunch 'n Munch thus constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful prong" of the UCL.

113.    Plaintiff suffered injury in fact and lost money or property as a result of Defendant's unlawful acts: he was denied the benefit of the bargain when he decided to purchase Crunch 'n Munch over competing products that are less expensive and/or contain no artificial trans fat.

114.    Had Plaintiff been aware of Defendant's unlawful tactics, he would not have purchased Crunch 'n Munch.

115.    Defendant's unlawful acts allowed them to sell more units of Crunch 'n Munch than they would have otherwise, and at a higher price, and higher margin.

116.    Plaintiff seeks an order for the disgorgement and restitution of all revenue received by Defendant from the sale of Crunch 'n Munch.

<strong><u>Second Cause of Action</u></strong>

<strong>Breach of Implied Warranty of Merchantability</strong>

117.    Defendant, through its acts and omissions set forth herein, in the sale, marketing and promotion of Crunch 'n Munch, made representations to Plaintiff and the Class that Crunch 'n Munch was safe to consume.

118.    Plaintiff and the Class bought Crunch 'n Munch manufactured, advertised, and sold by Defendant, as described herein.

119.    Defendant are merchants with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other members of the Class an implied warranty that those goods were merchantable.

120.    Defendant breached that implied warranty, however, in that Crunch 'n Munch was not fit for its ordinary purpose and did not conform with the representations on its labels, as set forth in detail herein.

121.    As an actual and proximate result of Defendant's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that they did not conform to the promises and affirmations made on the container or label of the goods.

122.    Plaintiff and Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Crunch 'n Munch's purchase price.

**Third Cause of Action**

**Unfair Competition Law**

**Bus. & Prof. Code §§ 17200 *et seq.***

**(Limited to the "0g Trans Fat" Subclass)**

**Unlawful Conduct**

123.    Defendant has made and distributed, in interstate commerce and in this county products that make false or misleading statements of fact regarding their content. Crunch 'n Munch was placed into interstate commerce by Defendant and sold throughout the country and throughout California.

124.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unlawful" business acts and practices in that Defendant's conduct violates the California False Advertising Law, as alleged herein.

125.    Defendant's conduct is further "unlawful" because it violates the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically, (a) 21 U.S.C. § 343(a), which deems food misbranded when the label contains a statement that is "false or misleading in any particular," and (b) 21 C.F.R. § 101.13(i)(3), which bars nutrient content claims voluntarily placed on the front of a product label that are "false or misleading in any respect."

126.    ConAgra further violates the FDCA's implementing regulation, 21 C.F.R. § 1.21, because Crunch 'n Munch's packaging fails to reveal material facts, namely the dangers of PHO described in detail herein, "in light of other representations," namely the misleading "0g Trans Fat" front label claim

127.    Defendant's conduct further violates The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular," and Health & Safety Code § 110670, which bars nutrient content claims voluntarily placed on the front of a product label that fail to comply with the federal regulation for nutrient content claims (i.e., "may not be false or misleading in any respect"). Defendant's conduct also violates the following sections of the Sherman Law:

•  § 110100 (adopting all FDA food labeling regulations as state regulations);

•  § 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading,

22

all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.");

• § 110390 ("It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any particular.");

• § 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

• § 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

• § 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .");

• § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto.");

• § 110680 ("Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).");

• § 110705 ("Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.");

• § 110760 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");

• § 110765 ("It is unlawful for any person to misbrand any food."); and

• § 110770 ("It is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.").

128.   All of the challenged labeling statements made by ConAgra thus constitute violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

23

129.    Defendant leveraged its deception to induce Plaintiff and members of the Subclass to purchase products that were of lesser value and quality than advertised.

130.    Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he decided to purchase Crunch 'n Munch over competitor products that are not adulterated with artificial trans fat.

131.    Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would not have purchased Crunch 'n Munch, and had Defendant not advertised and sold Crunch 'n Munch in a fraudulent manner, he would have paid less for it.

132.    Plaintiff also seeks an order for the restitution of all revenue received by Defendant from the sale of Crunch 'n Munch which was acquired through acts of unlawful, unfair, or fraudulent competition.

**Fraudulent Conduct**

133.    Defendant leveraged its deception to induce Plaintiff and members of the Subclass to purchase products that were of lesser value and quality than advertised.

134.    Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he decided to purchase Crunch 'n Munch over competitor products, which are less expensive or contain no artificial trans fat.

135.    The acts of Defendant as alleged herein constitute "fraudulent" business acts and practices in that Defendant's conduct has a likelihood, capacity or tendency to deceive Plaintiff, the Subclass, and the general public.

136.    Plaintiff further seeks an order for the restitution of all revenue received by Defendant from the sale of Crunch 'n Munch containing artificial trans fat and the false "0g Trans Fat" nutrient content claim.

**Unfair Conduct**

137.    Defendant leveraged its deception to induce Plaintiff and members of the Subclass to purchase products that were of lesser value and quality than advertised.

138.     Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he decided to purchase Crunch 'n Munch over competitor products, which are less expensive and/or contain no artificial trans fat.

139.     Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would not have purchased Crunch 'n Munch, and had Defendant not advertised it in a fraudulent manner, Plaintiff would have paid less for them.

140.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unfair" business acts and practices because Defendant's conduct is:

a.     immoral, unethical, unscrupulous, and offends public policy;

b.     the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct; and

c.     the injury to consumers caused by Defendant's conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

141.     Plaintiff seeks an order for the restitution of all revenue received by Defendant from the sale of Crunch 'n Munch which was acquired through acts of unlawful, unfair, or fraudulent competition.

**Fourth Cause of Action**

**California False Advertising Law,**

**Bus. & Prof. Code §§ 17500 *et seq*.**

**(Limited to the "0g Trans Fat" Claim Subclass)**

142.     In violation of Bus. & Prof. Code §§ 17500 *et seq*., the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of Crunch 'n Munch without the knowledge that they contained harmful amounts of toxic artificial trans fat.

143.     Defendant knew and reasonably should have known that the claims made on the label of Crunch 'n Munch were untrue and misleading.

144.     As a result, Plaintiff, the Subclass, and the general public are entitled to equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant were unjustly enriched.

**Fifth Cause of Action**

**Breach of Express Warranty**

**(Limited to the "0g Trans Fat" Subclass)**

145.    ConAgra made written representations to the public, including Plaintiff, with its front label "0g Trans Fat" claim.

146.    These promises and related promises printed on the label became part of the basis of the bargain between the parties and thus constituted an express warranty.

147.    Thereon, ConAgra sold the goods to Plaintiff and other consumers.

148.    However, ConAgra breached this express warranty in that Crunch 'n Munch does not contain "0g Trans Fat" because it contained partially hydrogenated oil, which necessarily contains artificial trans fat.

149.    As a result of this breach, Plaintiff and other consumers did not receive goods as warranted by ConAgra.

150.    As a proximate result of this breach of warranty by ConAgra, Plaintiff and other consumers have been damaged in an amount to be determined at trial.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, all others similarly situated, and the general public, prays for judgment against Defendant as follows:

A.    An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiff and his undersigned counsel to represent the Class, and requiring Defendant to bear the cost of class notice;

B.    Damages for breach of warranty

C.    An order requiring Defendant to pay restitution to Plaintiff and class members so that they may be restored the money which Defendant acquired by means of any unfair, deceptive, unconscionable, fraudulent, and negligent acts;

D.    An award of pre-judgment and post-judgment interest;

E.    An award of attorney fees and costs; and

F.    Such other and further relief as this Court may deem just, equitable, or proper.

1

**XV.     NO JURY DEMAND**

2

    Plaintiff does not demand a trial by jury.

3

DATED: November 6, 2018                Respectfully Submitted,

4

5

s/ Gregory S. Weston
**THE WESTON FIRM**

6

GREGORY S. WESTON
ANDREW C. HAMILTON

7

1405 Morena Blvd., Suite 201
San Diego, CA 92110

8

Telephone:      (619) 798-2006
Facsimile:      ((619) 343-2789

9

10

**Counsel for Plaintiff**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27

I.      **Appendix A: List of Popcorn Snacks Free of Trans Fat**

- Cracker Jack distributed by Frito-Lay North America, Inc. including all of the following flavors:
  - Butter Toffee Flavored Popcorn
  - Chocolate and Caramel Flavored Popcorn
  - Kettle Corn Flavored Popcorn
  - Original Caramel Coated Popcorn & Peanuts
  - Chocolate Peanut Butter Flavored Popcorn
- LesserEvil distributed by LesserEvil Healthy Brands, Inc. including all of the following varieties:
  - Buddha Bowl Himalayan Pink
  - Buddha Bowl Himalayan Sweetness
  - Buddha Bowl Classic Cheddah
  - Buddha Bowl Avocado-Licious
  - Chia Pop Classic Theater Style
  - Chia Pop Aged White Cheddar
  - Chia Pop Sea Salt and Cracked Pepper
- Skinny Pop distributed by SkinnyPop Popcorn including all of the following varieties:
  - Original Lightly Salted
  - Black Pepper
  - White Cheddar
  - Naturally Sweet
- Poppycock distributed by ConAgra Foods, Inc. including all of the following varieties:
  - Poppycock Pecan Delight
  - Poppycock Original
  - Poppycock Cashew Lovers
  - Poppycock Apple Crisp
- Fiddle Faddle distributed by ConAgra Foods, Inc. including all of the following varieties:
  - Butter Toffee
  - Caramel

CLASS ACTION COMPLAINT