**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
ANDREW C. HAMILTON (299877)
*andrew@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:      (619) 798-2006
Facsimile:      (619) 343-2789

**Counsel for Plaintiff**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK BEASLEY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONAGRA BRANDS, INC.,<br><br>Defendant. | Case No: 3:18-cv-06730-SI<br>Pleading Type: Class Action<br><br>**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**<br><br>Judge: The Honorable Susan Ilston<br>Hearing Date: March 22, 2019<br>Time: 9:00 a.m.<br>Location: Courtroom 1 |

# TABLE OF CONTENTS

I.     STATEMENT OF ISSUES TO BE DECIDED ................................................................1
II.    INTRODUCTION AND STATEMENT OF RELEVANT FACTS ...........................................1
III.   THE DANGERS OF DEFENDANT'S CHALLENGED BUSINESS PRACTICE ..................3
IV.    CONAGRA VIOLATED STATE AND FEDERAL LAW DURING THE CLASS PERIOD
       BY USING PHO, AN UNAPPROVED AND UNSAFE FOOD ADDITIVE. .........................4
V.     CONAGRA HAS NOT MET ITS BURDEN OF OVERCOMING THE FORCEFUL
       PRESUMPTION AGAINST PREEMPTION. .................................................................7
VI.    SECTION 754 REGULATES ONLY THE FDA, NOT THE STATES. ...............................8
VII.   SECTION 754, EVEN IF IT PREEMPTED CALIFORNIA LAW, WOULD NOT PREEMPT
       RIPE CLAIMS OVER TRANSACTIONS BEFORE ITS PASSAGE. ...................................11
VIII.  SECTION 754 IS NOT REMOTELY SIMILAR TO PRIOR ACTS OF CONGRESS
       RETROACTIVELY PREEMPTING STATE TORT LAW. .................................................12
IX.    PLAINTIFF HAS STATUTORY STANDING FOR HIS ADVERTISING CLAIMS. ..........14
X.     NO SAFE HARBOR PROTECTS CONAGRA. .............................................................15
XI.    DEFENDANT'S ARGUMENT THAT A CONSUMER FRAUD PLAINTIFF CANNOT
       PLEAD UCL, CLRA, AND FAL CLAIMS TOGETHER IS CONTRARY TO OPINIONS
       OF THE NINTH CIRCUIT AND CALIFORNIA SUPREME COURT. ..............................16
XII.   PLAINTIFF PLAUSIBLY PLEADS TIMELY CLAIMS. ...............................................17
XIII.  PLAINTIFF ADEQUATELY ALLEGES BREACH OF IMPLIED WARRANTY. ..............19
XIV.   PLAINTIFF'S COMPLAINT COMPLIES WITH RULE 9(B). .......................................20
XV.    PRIMARY JURISDICTION ABSTENTION, AN UNUSUAL DOCTRINE TO BE
       "INVOKED SPARINGLY," DOES NOT APPLY TO PLAINTIFF'S STATE-LAW
       CONSUMER PROTECTION CLAIMS. .......................................................................21

       A.     No Complex Scientific Issue or Question of First Impression Exists, and Theoretical
              Food Additive Petitions Do Not Necessitate Primary Jurisdiction Abstention. ...........22
       B.     Dismissal Would Allow the Statute of Limitations to Run. ........................................23

XVI.   A STAY PENDING *MCGEE* IS UNWARRANTED. .....................................................23
XVII.  PLAINTIFF COMPLIES WITH THE CLRA. ..............................................................24
XVIII. CONCLUSION.......................................................................................................25

i

## TABLE OF AUTHORITIES

**CASES**

*Altria Group, Inc. v. Good*,
   555 U.S. 70 (2008) ........................................................................................................ 7

*Am. Dredging Co. v. Miller*,
   510 U.S. 443 (1994) ...................................................................................................... 24

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*,
   870 F.3d 1140 (9th Cir. 2017) ....................................................................................... 7

*Backus v. Gen Mills*,
   122 F. Supp. 3d 909 (N.D. Cal. 2015) ........................................................................... 3

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ...................................................................................................... 12

*Brown v. MCI Worldcom Network Servs., Inc.*,
   277 F.3d 1166 (9th Cir. 2002) ..................................................................................... 23

*Brown v. Wells Fargo Bank, N.A.*,
   869 F. Supp. 2d 51 (D.D.C. 2012) ............................................................................... 12

*Cavel Int'l, Inc. v. Madigan*,
   500 F.3d 551 (7th Cir. 2007) ......................................................................................... 8

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010) ....................................................................... 21

*Chinatown Neighborhood Ass'n v. Harris*,
   794 F.3d 1136 (9th Cir. 2015) ....................................................................................... 8

*Cutler v. Hayes*,
   549 F. Supp. 1341 (D.D.C. 1982) ................................................................................... 6

*Davel Commc'ns. v. Qwest Corp.*,
   460 F.3d 1075 (9th Cir. 2006) ..................................................................................... 22

*Davidson v. Kimberly-Clark Corp.*,
   873 F.3d 1103 (9th Cir. 2017) ..................................................................................... 17

*De La Torre v. CashCall, Inc.*,
   5 Cal. 5th 966 (2018) ................................................................................................... 17

*Delacruz v. Cytosport, Inc.*,
   2012 U.S. Dist. LEXIS 90847 (N.D. Cal. June 28, 2012) ...................................... 21, 22

*Evans v. Linden Research, Inc.*,
763 F. Supp. 2d 735 (E.D. Pa. 2011) ........................................................................................ 24

*Favila v. Katten Muchin Rosenman LLP*,
188 Cal. App. 4th 189 (2010) .................................................................................................... 18

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963)..................................................................................................................... 8

*Forcellati v. Hyland's, Inc.*,
876 F. Supp. 2d 1155 (C.D. Cal. 2012) ..................................................................................... 19

*Gianitsis v. Am. Brands, Inc.*,
685 F. Supp. 853 (D.N.H. 1988).............................................................................................. 11

*Greene v. Five Pawns, Inc.*,
2016 U.S. Dist. LEXIS 187866 (C.D. Cal. Aug. 30, 2016)........................................................ 6

*Guttmann v. Nissin Foods (U.S.A.) Co.*,
2015 U.S. Dist. LEXIS 92756 (N.D. Cal. July 15, 2015).......................................................... 16

*Hawkins v. Kroger*,
906 F.3d 763 (9th Cir. 2018) ......................................................................................... 1, 2, 15

*Hulteen v. AT&T Corp.*,
441 F.3d 653 (9th Cir. 2006) ................................................................................................... 13

*Hunt v. Sunny Delight Bevs. Co.*,
2018 U.S. Dist. LEXIS 146612 (C.D. Cal. Aug. 23, 2018)....................................................... 24

*Ileto v. Glock*,
565 F.3d 1126 (9th Cir. 2009) ................................................................................................. 11

*In re Farm Raised Salmon Cases*,
42 Cal. 4th 1077 (2008) ............................................................................................................. 7

*INS v. St. Cyr*,
533 U.S. 289 (2001)................................................................................................................... 11

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) ............................................................................................................. 18

*Jordan v. Paul Fin., LLC*,
745 F. Supp. 2d 1084 (N.D. Cal. 2010) ................................................................................... 16

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ................................................................................................. 20

iii

*Kraft Reins. Ir., Ltd. v. Pallets Acquisitions, LLC*,
   845 F. Supp. 2d 1342 (N.D. Ga. 2011) .............................................................................. 20

*Landgraf v. Usi Film Prods.*,
   511 U.S. 244 (1994) ..................................................................................................... 11, 13

*Lara v. LG Elecs. U.S.A., Inc.*,
   2018 U.S. Dist. LEXIS 132583 (D. Minn. Aug. 7, 2018) ...................................................... 24

*Martinez v. Bloomberg LP*,
   740 F.3d 211 (2d Cir. 2014) ............................................................................................... 24

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ....................................................................... 12

*Menhorn v. Firestone Tire & Rubber Co.*,
   738 F.2d 1496 (9th Cir. 1984) ........................................................................................... 11

*Molosky v. Wash. Mut., Inc.*,
   664 F. 3d 109 (6th Cir. 2011) ........................................................................................... 12

*Morgan v. AT&T Wireless Servs., Inc.*,
   177 Cal. App. 4th 1235 (2009) ......................................................................................... 24

*NBCUniversal Media, LLC v. Superior Court*,
   225 Cal. App. 4th 1222 (2014) ......................................................................................... 19

*Plumley v. Massachusetts*,
   155 U.S. 461 (1894) ........................................................................................................... 7

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ............................................................................................. 17

*Reid v. Johnson & Johnson*,
   780 F.3d 952 (9th Cir. 2015) ...................................................................................... passim

*Reiter v. Cooper*,
   507 U.S. 258 (1993) ......................................................................................................... 23

*Roches v. Cty. of Santa Clara*,
   2018 U.S. Dist. LEXIS 114756 (N.D. Cal. July 9, 2018) ...................................................... 18

*Sandoval v. PharmaCare US, Inc.*,
   145 F. Supp. 3d 986 (S.D. Cal. 2015) ............................................................................... 24

*Sciortino v. PepsiCo, Inc.*,
   108 F. Supp. 3d 780 (N.D. Cal. 2015) ............................................................................... 22

*Scott v. Boos*,
   215 F.3d 940 (9th Cir. 2000) ........................................................................................ 13, 14

iv

*Shivey v. Bozanich*,
     31 Cal. 4th 1230 (2003) .................................................................................................... 19

*Skeen v. BMW of N. Am., LLC*,
     2014 U.S. Dist. LEXIS 9256 (D.N.J. 2014) ...................................................................... 20

*Sloan v. GM, LLC*,
     287 F.Supp. 3d 840 (N.D. Cal. 2018) ................................................................................ 18

*Solus Indus. Innovations, LLC v. Superior Court*,
     4 Cal. 5th 316 (2018) ........................................................................................................ 17

*Sonner v. Schwabe N. Am., Inc.*,
     911 F.3d 989 (9th Cir. 2018) ............................................................................................. 17

*Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. 2013) ................................................................. 2, 7

*Tait v. BSH Home Appliances Corp.*,
     289 F.R.D. 466 (C.D. Cal. 2012) ...................................................................................... 19

*Takhar v. Kessler*,
     76 F.3d 995 (9th Cir. 1996) ............................................................................................ 5, 6

*Thomas F. White 1991 Tr. v. Connell*,
     2017 U.S. Dist. LEXIS 131828 (N.D. Cal. Aug. 16, 2017)............................................... 17

*United States v. Lembke Constr. Co.*,
     786 F.2d 1386 (9th Cir. 1986) .......................................................................................... 20

*Wyeth v. Levine*,
     555 U.S. 555 (2009)............................................................................................... 7, 9, 10

**STATUTES**

15 U.S.C. § 7901(a)(6)-(7).............................................................................................................. 12

15 U.S.C. § 7902............................................................................................................................ 12

15 U.S.C. § 7903............................................................................................................................ 12

21 U.S.C. § 331(a) ........................................................................................................................... 9

21 U.S.C. § 331(c) ........................................................................................................................... 9

21 U.S.C. § 348............................................................................................................................. 8, 9

21 U.S.C. § 348(a) ........................................................................................................................... 4

Cal. Bus. & Prof. Code § 17205 ..................................................................................................... 17

Cal. Code Civ. Proc. § 458 ................................................................................................ 18

Cal. Com. Code § 2316.................................................................................................... 19

Cal. Health & Saf. Code § 110398 .................................................................................. 16

Cal. Health & Saf. Code § 110440 .................................................................................. 16

Cal. Health & Saf. Code § 110670 .................................................................................. 16

Cal. Health & Saf. Code § 110680 .................................................................................. 16

Cal. Health & Saf. Code § 110760 .................................................................................. 16

Cal. Health & Saf. Code § 110765 .................................................................................. 16

Cal. Health & Saf. Code § 110770 .................................................................................. 16

Cal. Health & Saf. Code § 110395 .................................................................................. 16

New York City Health Code § 81.08................................................................................ 10

Pub. Law 85-929 (Sept. 6, 1958) ...................................................................................... 4

**OTHER AUTHORITIES**

80 Fed. Reg. 34650 (June 17, 2015) ..................................................................... 5, 6, 10, 23

81 Fed. Reg. 54959 (Aug. 17, 2016)................................................................................. 6

Congressional Research Service, Summary of Public Law 114-113 (2015).......................... 9

Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601-13, 1609 (2006)................................................................................. 3, 4

Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-38 (2009) ............................ 3

## I.   STATEMENT OF ISSUES TO BE DECIDED

1) Does Plaintiff Mark Beasley state non-preempted claims under California law?

2) Did he comply with applicable notice and venue sections of the CLRA?

## II.   INTRODUCTION AND STATEMENT OF RELEVANT FACTS

ConAgra's lengthy and confusing motion goes to the end of the 25th page, and includes 69 lines of footnotes. It cites case after case involving standing, primary jurisdiction, or preemption of trans fat claims—at least thirteen of them—but does not cite, not even once, the two published cases from the Ninth Circuit that together directly address all three of these issues.

This case involves the dangerous use of trans fat in Crunch 'n Munch and its false and unlawful "0g trans fat" label claim. In *Reid v. Johnson & Johnson*, 780 F.3d 952 (9th Cir. 2015), a margarine maker also used trans fat and falsely labeled it "No Trans Fat." The district court denied the defendant's primary jurisdiction argument, but dismissed on preemption grounds. The Ninth Circuit affirmed the denial of primary jurisdiction, while reversing the preemption dismissal. Yet ConAgra could not be bothered to include this case in its baker's dozen of trans fat case citations arguing for primary jurisdiction and preemption.

In *Hawkins v. Kroger*, 906 F.3d 763 (9th Cir. 2018) the defendant once again used trans fat while falsely labeling it "0g trans fat." The Ninth Circuit found the plaintiff had standing for all of her claims, and further reversed the one preemption finding the district court made. While repeatedly citing unpublished Ninth Circuit cases, or district court decisions that are irreconcilable with *Hawkins*, ConAgra never once cites *Hawkins*.

This lack of candor also extends to ConAgra's description of the Beasley's allegations. For instance, ConAgra states "Plaintiff claims that in October 2018, however, he allegedly learned previous formulations of Crunch 'n Munch contained ***trace amounts*** of trans fat in the form of PHO. Id. ¶ 91." Mot. at 4 (emphasis added). In fact, the FAC never uses the word "trace" to describe the amount of trans fat in Crunch 'n Munch. Rather, the FAC's only descriptors of the "amount" of trans fat used in Crunch 'n Munch are "substantial," "dangerous," and "harmful." *See* FAC ¶¶ 9 and 127. "Parties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *Stengel v. Medtronic, Inc.*, 704 F.3d

1

1224, 1227 (9th Cir. 2013). Having failed to even  once cite the controlling authority of *Reid* and *Hawkins*, or even describe the FAC accurately, ConAgra didn't even take the first step of meeting its "considerable burden" as the party arguing our state laws are preempted.

The FAC alleges that "ConAgra manufactured, marketed, and sold popcorn snacks containing partially hydrogenated oil ('PHO') under the brand name Crunch 'n Munch" and that "PHO was and is an unlawful and dangerous food additive due to its artificial trans fat content. Artificial trans fat is a toxic substance whose unlawful use contributed to hundreds of thousands of untimely deaths." FAC ¶¶ 4-5. *See also Hawkins*, 906 F.3d at 766 ("Trans fat has become increasingly recognized as a dangerous substance and a leading cause of numerous serious ailments, including heart disease and diabetes.").

ConAgra "defrauded the class by using the false and unauthorized '0g Trans Fat' nutrient content claim on Crunch 'n Munch packaging. All PHO, however, contains trans fat, and the amount in Crunch 'n Munch was not '0g,' but a substantial and dangerous amount." FAC ¶ 9.

With support from dozens of peer-reviewed medical journal articles, Beasley alleges consuming PHO "damages vital organs, including the heart, brain, and reproductive system," FAC ¶ 54, and "inflames and damages the cardiovascular system and increases the risk of heart disease, diabetes, cancer, and death." *Id.* ¶ 86. "During the entire class period, inexpensive and commercially viable alternatives to PHO existed, and were used in many competitor products," but "[i]n order to increase profits, ConAgra instead sold an unsafe and illegal product." *Id.* ¶ 8.

PHO is an unlawful food additive. It is unlawful under both California and federal law, precluding any argument for conflict preemption, because state and federal law are in accord. Specifically, PHO was illegal to use in Crunch 'n Munch during the class period because (1) California law requires food additives be free of "deleterious substances" that are "injurious to the health of man," and the FAC describes why PHO fails this test; (2) federal law similarly requires food additives to be generally recognized as safe ("GRAS"), and the complaint describes why PHO never was GRAS during the class period; and (3) ConAgra's particular use of PHO, adding it to caramel popcorn, is an unfair business practice under the UCL's utilitarian "balancing test." Specifically, the practice imposed more harm onto consumers than justified by its benefit to ConAgra.

With these allegation, Beasley states a claim that trans fat use violates

2

California's Sherman Act, because he plausibly alleges that they are injurious to health and there does not appear to be an applicable statutory or regulatory provision that otherwise exempts them from the Sherman Act. He has therefore plausibly alleged an "unlawful" claim under the UCL, and this cause of action will not be dismissed.

*Backus v. Gen Mills*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015).

### III.    THE DANGERS OF DEFENDANT'S CHALLENGED BUSINESS PRACTICE

Did Congress really intend to immunize companies from state laws protecting the public from fraud and protecting the health of their citizens from heart attacks, diabetes, and cancer?

Dariush Mozaffarian of Harvard Medical School, several years before the class period began in this case, wrote that "from a nutritional standpoint, the consumption of trans fatty acids results in considerable potential harm but no apparent benefit" and advocated a complete or near-complete avoidance of industrially produced trans fat.[1] Julie Louise Gerberding, the long-time director of the CDC, similarly wrote, before the class period here commenced:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium. The strong evidence of harm… Eliminating exposure to these dangerous fats could have a powerful population impact— potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[2]

Dr. Mozaffarian further writes:

> Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues,

---

[1] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENGL. J. MED. 1601-13, 1609 (2006).

[2] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-38 (2009).

3

which have in some cases received considerable attention.

354 N. ENGL. J. MED. at 1609. These reputable authorities unequivocally stating trans fat is dangerous show there was no argument it qualified as generally recognized as safe. Yet federal law required such general recognition of safety for a food additive to be lawfully used. On top of these authorities, the FAC alleges and describes in detail that PHO causes heart disease (¶¶ 25-35), cancer (¶¶ 41-46), type-2 diabetes (¶¶ 36-40), and Alzheimer's disease/cognitive decline (¶¶ 47-53).

## IV.    CONAGRA VIOLATED STATE AND FEDERAL LAW DURING THE CLASS PERIOD BY USING PHO, AN UNAPPROVED AND UNSAFE FOOD ADDITIVE.

In 1958 Congress passed the Food Additives Amendment to the FDCA, Pub. Law 85-929 (Sept. 6, 1958). The statute prohibited the use of food additives unless they had been affirmatively determined to be "generally recognized as safe" or "GRAS." The law established a procedure where a food manufacturer could petition the FDA to determine a food additive is GRAS. The FDA has also reviewed the safety of several hundred food additives *sua sponte*, and maintains a list of GRAS food additives online, with updates regularly published in the Federal Register. For a limited group of older food additives in wide use before 1958, a manufacturer can also review scientific evidence on its own in what the FDA calls a "GRAS self-determination." Defendant failed to follow either procedure.

What is important about this system is the FDA does not need to affirmatively deem a substance adulterated or unsafe for its use to be unlawful: **all food additives are unlawful until there is a GRAS determination**. This is the same system the FDA uses for trans fat nutrient content claims like "0g trans fat," at issue in *Reid* and *Hawkins*. For both food additives and nutrient content claims like "0g trans fat," the default is they are illegal, and the FDA's role is to define permitted exceptions. 21 U.S.C. § 348(a) states that food additives are all "***unsafe*** for the purposes of the application of clause (2)(C) of section 342(a) of this title, ***unless***" and then proceeds to describe the two broad exemptions: determination by the FDA of safety (by petition or *sua sponte*), or a GRAS self-determination. (emphasis added). *Reid* and *Hawkins* show how to perform the preemption analysis of such a federal rule: if a plaintiff can show a nutrient content claim was not permitted by federal law, then it is prohibited because "[u]nder the FDA

4

regulations, the general rule is that 'nutrient content claims' are not permitted on food labels." *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015).

In 2015, the FDA affirmatively stated no exception exists and formally declared PHO "is not GRAS for any use in human food." 80 Fed. Reg. 34650, 34651 (June 17, 2015). Therefore, on June 17, 2015, it was unlawful for any manufacturer to introduce any food containing PHO into interstate commerce, because PHO, by this FDA declaratory order, "is not GRAS for any use in human food." As part of the same order, the FDA opined there is neither express nor conflict preemption:

> There is no statutory provision in the FD&C Act providing for express preemption of any state or local law prohibiting or limiting use of PHOs in food, including state or local legislative requirements or common law duties. [...] FDA believes, however, that state or local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with federal law, or to frustrate federal objectives.

80 Fed. Reg. at 34655. Thus, the very agency writing the order stated that even the strongest possible state laws regarding PHO, namely those that "**prohibit**" it in food, "are not likely to be in conflict with federal law, or to frustrate federal objectives." 80 Fed. Reg. at 34655 (emphasis added).

The better analysis of the FDA's compliance period is an announced exercise of prosecutorial discretion, during which time manufacturers would be free from federal prosecution for the illegal act of using a non-GRAS food additive. ConAgra, to invoke conflict preemption, would need to show that it was a federal policy that food companies should break food safety laws by violating 21 U.S.C. § 342(a)(2) and using a non-GRAS food additive during the compliance period. But there is no precedent for an FDA compliance period or statement of enforcement discretion having preemptive effect over state laws. Rather, statements of enforcement policies such as compliance periods:

> merely set forth which instances of such illegal use the FDA is likely to view as requiring it to take enforcement action and which instances, while technically violative of the statute, will not ordinarily be subject to enforcement action.

*Takhar v. Kessler*, 76 F.3d 995, 1002 (9th Cir. 1996). Following *Takhar*, Judge Carter rejected a similar argument claiming an FDA compliance period conflict-preempted California's UCL:

> Defendant appears to treat the compliance period as if it conveyed a substantive right to be free of all regulations during the period. [citation] The compliance policy, however, does not have the force of law [...] In [*Takhar*], the FDCA itself made the conduct illegal, and the regulation merely

5

explained "how the FDA will use its limited resources in enforcing existing law." [*Takhar*, 76 F.3d at 1001-02] Applied here, the compliance policy is the FDA's public statement that it will temporarily withhold enforcement of certain portions of the FDCA which by statute are now fully applicable to ENDS products. The FDA's decision to do so, however, has no effect on state law requirements. [ . . . E]ven if the FDA had expressly chosen not to require disclosure of AP and DA, Defendant has not explained how greater disclosure under state law is an obstacle to achieving any federal objective.

*Greene v. Five Pawns, Inc*., 2016 U.S. Dist. LEXIS 187866, at \*31-33 (C.D. Cal. Aug. 30, 2016). *See also Cutler v. Hayes*, 549 F. Supp. 1341, 1345 (D.D.C. 1982) (FDA has "considerable prosecutorial discretion as to when and how to proceed against unlawfully marketed products"); *Reid*, 780 F.3d at 965 (declining to give the FDA's "statements of its enforcement policy" preemptive effect "because agency decisions not to take enforcement action are usually committed to agency discretion by law and thus generally not subject to judicial review").

The parallel to this action is strong. Here, the FDA's Final Determination states, again and again, without any qualification, that "PHOs are not GRAS for any use in human food" and "FDA has determined that PHOs are not GRAS for any use in human food." 80 Fed. Reg. at 34651, 34667. GRAS status, however, is required to lawfully use a food additive. 21 U.S.C. § 342(a)(2)(C)(i). *See also* 81 Fed. Reg. 54959, 54961 (Aug. 17, 2016) ("a food manufacturer can intentionally add a substance to human food or animal food without our premarket review or approval [only] if the substance is generally recognized, among qualified experts, to be safe under the conditions of its intended use (GRAS)."). Thus, as in *Takhar* and *Greene*, the compliance period describes acts that, while "violative of the statute, will not ordinarily be subject to enforcement action" by the FDA, and is a "public statement that it will temporarily withhold enforcement of certain portions of the FDCA." *Takhar*, 76 F.3d at 1002; *Greene*, 2016 U.S. Dist. LEXIS 187866 at \*32.

A period of federal non-enforcement is also exactly how the Ninth Circuit characterized the issue in *Hawkins*, describing it as "the FDA gave food companies the three-year window ***before it would begin enforcement*** of the new determination" and then "[t]his three-year window was statutorily embraced" by Congress in the CAA's § 754. *Hawkins*, 906 F.3d at 772-73 (emphasis added). These references to "begin enforcement" and "three-year-window" support Plaintiff's case that in passing § 754, Congress

had no intent to preempt state law, especially not for claims predating its passage, but rather were only seeking delay federal enforcement actions.

## V.    CONAGRA HAS NOT MET ITS BURDEN OF OVERCOMING THE FORCEFUL PRESUMPTION AGAINST PREEMPTION.

[I]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal citations omitted).

The presumption against preemption "applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008). California "consumer protection laws such as the [UCL], false advertising law, and CLRA, are within the states' historic police powers and therefore are subject to the presumption against preemption. Laws regulating the proper marketing of food, including the prevention of deceptive sales practices, are likewise within states' historic police powers." *In re Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1088 (2008). *Accord*, *Plumley v. Massachusetts*, 155 U.S. 461, 472 (1894).

"Parties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *Stengel*, 704 F.3d at 1227; *Farm Raised Salmon*, 42 Cal. 4th at 1088 (California-law claims involving the artificial coloring of salmon are not preempted by weaker federal food color regulations). If there is a "plausible alternative reading" of a statute, courts "have a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences*, *LLC*, 544 U.S. 431, 449 (2005). Here, the text of § 754 says nothing about the states or state law. Thus, it is a "plausible alternative reading" that a the rider, which does not mention state law or preemption, does not intend to preempt state law.

"[S]afeguarding the health and safety of citizens . . . is a field traditionally regulated by the states" so "compelling evidence of an intention to preempt is required." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1146 (9th Cir. 2017) (internal citations omitted). That case found that the California law prohibiting fois gras is not preempted despite federal law permitting and regulating

7

such sales. Likewise, in *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir. 2007), the Fifth Circuit found no preemption of the Texas ban on horse meat. This despite the fact that federal law expressly allowed the sale of "meat food product of a horse, mule or other equine" so long as it is "plainly and conspicuously marked or labeled." *Id*. at 330. The Seventh Circuit came to the same conclusion. *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007) (Congress passing laws that regulate horse meat production and sale was "not a decision that states must allow horses to be slaughtered for human consumption."). In yet another case, the Ninth Circuit found California's shark fin food ban did not conflict with federal shark fishing law which expressly permitted and regulated shark fin harvest and sale. *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1142-44 (9th Cir. 2015). In *Reid* and *Hawkins*, the Ninth Circuit found that UCL challenges to the labeling of margarine and bread crumbs containing PHO were not preempted by the extensive federal law dealing with food labeling. *Reid*, 780 F.3d at 959; *Hawkins* 906 F.3d at 772.

In short, in case after case, the circuit courts have followed the Supreme Court in *Plumley* and *Florida Lim*e: a higher state-law standard for foods, that renders some foods legal under federal law but illegal under state law, does not meet the high standard for preemption of state law in the traditional area of state regulation of food. A difference of state and federal law is simply not enough; "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963) (California's more burdensome regulation for the maturity of avocados was not preempted by a lower federal standard).

## VI.     SECTION 754 REGULATES ONLY THE FDA, NOT THE STATES.

Nothing in Section 754 suggests that California law prohibiting PHOs stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

First, Section 754 provides that no PHO shall be deemed unsafe within the meaning of 409(a) (21 U.S.C. § 348(a)). Title 21 U.S.C. § 348(a) provides, in relevant part, "[a] food additive shall, with respect to any particular use or intended use of such additives, be deemed to be unsafe *for the purposes of the application of clause (2)(C) of section 402(a) . . . .*" (emphasis added). Section 754, therefore, provides

8

that PHO shall not be deemed unsafe for the purposes of the application of clause (2)(C) of section 402(a) (21 U.S.C. § 342(a)(2)(C)).

Second, the CAA provides that no food containing PHO shall be deemed adulterated under sections 402(a)(1) or 402(a)(2)(C)(i). Section 402(a) (21 U.S.C. § 342(a)) provides, in relevant part, "[a] food shall be deemed to be adulterated . . . [i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health . . . or . . . if it is or if it bears or contains [] any food additive that is unsafe *within the meaning of section 409 (21 U.S.C. § 348)*."

Section 342 is given effect by 21 U.S.C. § 331(a) & (c)—which prohibits the sale, delivery, and receipt of "any food . . . that is adulterated." In sum, Congress has provided only that food containing PHO shall not be deemed adulterated under 21 U.S.C. § 342 until June 18, 2018. Thus, in every respect, Section 754 speaks about the regulatory structure of the FDCA. In contrast to the many citations to federal law, there is not one word about state law or preemption. The natural reading of the law is therefore exactly that of the Congressional Research Service, whose entire summary of Section 754 is "(Sec. 754) *Prohibits the FDA* from deeming partially hydrogenated oils to be unsafe or any food containing a partially hydrogenated oil to be adulterated prior to June 18, 2018." Congressional Research Service, Summary of Public Law 114-113 (2015)[3] (emphasis added).

In *Wyeth*, a Vermont plaintiff stated "failure-to-warn" and common law negligence claims against a drug manufacturer defendant when "[t]he warnings on Phenergan's label had been deemed sufficient by the" FDA. *Wyeth*, 555 U.S. at 558. The issue of the case was therefore "whether the FDA's drug labeling judgments 'preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use.'" *Wyeth*, 555 U.S. at 563. The court concluded that "it is not impossible for Wyeth to comply with its state-and federal-law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the FDCA." *Wyeth*, 555 U.S. at 581. "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history." *Wyeth*, 555 U.S. at 574. "Its silence on the issue, coupled with its certain

---

[3] *Available at* www.congress.gov/bill/114th-congress/house-bill/2029 (last visited 2/13/19).

9

awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Wyeth*, 555 U.S. at 575.

"The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth,* 555 U.S. at 575 (citations and internal quotations omitted). The same can surely be said about Section 754, where the first sentence cites to the FDA's June 2015 Final Determination on PHO. That regulation expressly discusses preemption, specifically it states that the FDA was aware of even stricter state and local laws on preemption, and did not believe they conflicted with its more relaxed policy of enforcement discretion and a three year delay before it enforced compliance. Specifically, the FDA regulation cited by Congress in Section 754 says:

> There is no statutory provision in the FD&C Act providing for express preemption of any state or local law prohibiting or limiting use of PHOs in food, including state or local legislative requirements or common law duties. […] FDA believes, however, that state or local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with federal law, or to frustrate federal objectives.

80 Fed. Reg. 34650, 34655 (June 17, 2015).

Thus, as in *Wyeth*, Congress must have been aware of these state and local laws "prohibiting or limiting use of PHOs in food," as it cited an FDA regulation that mentions these laws and opines they are neither expressly nor conflict preempted. Yet, with this opportunity to state the FDA was wrong, and preempt cases like this based on state law, Congress declined to say a word about state law or preemption.

Even if Section 754 had not cited the FDA regulation that later discussed and stated it did not likely preempt state laws prohibiting or banning PHO, these laws are hardly new or obscure. New York City banned trans fat in its 20,000 food establishments in 2006. *See* New York City Health Code § 81.08. There are at least 17 state and local regulations prohibiting the use of trans fats in food.[4] If Congress had intended to preempt such food safety regulations, surely it would have been clearer.

---

[4] *See* National Restaurant Association, State and Local Enacted Trans Fat Bans, www.restaurant.org/downloads/pdfs/advocacy/maps/map_transfat.pdf (July 16, 2013).

**VII.   SECTION 754, EVEN IF IT PREEMPTED CALIFORNIA LAW, WOULD NOT PREEMPT RIPE CLAIMS OVER TRANSACTIONS BEFORE ITS PASSAGE.**

ConAgra contends Plaintiff's "use" claims are retroactively preempted by the Consolidated Appropriations Act, 2016. Mot. at 8-10. This argument lacks merit.

Here, most of Plaintiff's purchases of Crunch 'n Munch occurred before Section 754 was passed. FAC ¶¶ 60-64; 91-92. A statute operates retroactively if "the new provision attaches new legal consequences to events completed before its enactment." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 269-70 (1994). For legislation to apply retroactively, it "is a requirement that Congress manifest the retroactive nature of legislation with 'clear intent.'" *Ileto v. Glock*, 565 F.3d 1126, 1138 (9th Cir. 2009). The language must be "so clear that it could sustain only one interpretation." *INS v. St. Cyr*, 533 U.S. 289, 317 (2001). In an appropriations rider such as Section 754, such clear intent must be found in the text of the rider itself. *United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir. 2016). The text of Section 754 thus does not suggest at all that it is retroactive, much less an intent to be retroactive that is "so clear that it could sustain only one interpretation." *St. Cyr*, 533 U.S. at 317.

When Congress intends for legislation to apply retroactively, it does so without ambiguity. Where Congress has not provided a clear statement that a statute should be applied retroactively, such an application is inappropriate. *Ileto*, 565 F.3d at 1138. *See also Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1504 (9th Cir. 1984) ("A statute will not be given retroactive effect absent clear legislative intent.").

In *Gianitsis v. Am. Brands, Inc.*, the court found that "Federal Labeling Act of 1966, has no retroactive application, and therefore does not preempt those claims for inadequate warnings which arose prior to passage of the legislation." 685 F. Supp. 853, 859 (D.N.H. 1988). In *Molosky v. Wash. Mut., Inc.*, the Sixth Circuit declined to apply the Dodd-Frank Act retroactively, holding

> Passage of the Dodd-Frank Act has changed both the type of preemption applicable under HOLA and the identity of the agency that oversees federal savings and loan associations. *See* 12 U.S.C. §§ 1465(a), 5412(b). These provisions came into effect on July 21, 2011, and have no retroactive effect with regard to the issues in this appeal.

664 F. 3d 109, 113 n.1 (6th Cir. 2011). *See also Brown v. Wells Fargo Bank, N.A.*, 869 F. Supp. 2d 51, 56 n.5 (D.D.C. 2012) ("Because the Act was passed after plaintiff received the loan at issue, the changes are not relevant to the issues before the Court."); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

## VIII.   SECTION 754 IS NOT REMOTELY SIMILAR TO PRIOR ACTS OF CONGRESS RETROACTIVELY PREEMPTING STATE TORT LAW.

The Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-03 was passed by Congress in 2005 and retroactively preempts state tort suits against firearm manufacturers, even pending actions solely related to past conduct. In other words, it has the same retroactive effect on past injuries that ConAgra urges the Court to find the 2016 CAA has in this case.

The texts of § 754 and the PLCAA, however, could not be more different. The PLCAA's text makes specific findings that tort suits against arms manufacturers are a burden on liberty, fundamental Constitutional rights, and interstate commerce, and directs that such suits "may not be brought in any Federal or State court" and that any such pending suit "shall be immediately dismissed by the court in which the action was brought or is currently pending." 15 U.S.C. § 7902.

The Supreme Court has repeatedly rejected claims of conflict preemption, cautioning that "Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The PLCAA's text illustrates this point. It makes strong and broadly-worded statements of intent to protect gun manufacturers, as well as findings that the filing of state tort suits against them "threatens the diminution of a basic constitutional right and civil liberty" and "constitute[s] a deprivation of the rights, privileges, and immunities guaranteed to a citizen of the United States." 15 U.S.C. § 7901(a)(6)-(7). Yet, notwithstanding this strong and explicit language of intent to stop such state tort suits, Congress did not cavalierly leave it to the courts to guess at what suits would be preempted to effectuate its intent. Instead, there is a careful, explicit, description of which suits are subject to its preemptive scope. The PLCAA then goes through, one by one, the sort of tort suits against gun companies that are not preempted, for instance fraud suits, suits alleging illegal sales to non-qualified buyers, breach of warranty suits, design defect suits, and negligent entrustment. 15 U.S.C. § 7903. The PLCAA thus

12

does several things § 754 does not: (1) clearly states its legislative purpose; (2) clearly states it applies to state-law suits; (3) clearly states which state law causes of action it preempts and which it does not; and (4) explicitly states it applies retroactively.

Here, on each of these questions, ConAgra implicitly suggests that Congress intended § 754 to have the same preemptive and retroactive reach as the PLCAA, but wanted courts to guess and infer this. While this is possibly Congress's intent, that is not enough, rather it must be the only plausible reading of the text.

ConAgra seems to contend that retroactive application would accord with the statute's intent, though there is no expression of intent in the statute beyond its explicit order, which is to the FDA, not the states or courts. Beyond this inferred preemption based on inferred intent, the problem with this argument is that it could also be said of most statutes, that making them retroactive supports the goals that motivated their passage. However, retroactivity is the rare exception, not the rule, and a much stronger indication of Congressional intent is required. As Justice Stevens held in finding an amendment to the federal sex discrimination statute to not be retroactive:

> It will frequently be true, as petitioner and amici forcefully argue here, that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity. Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal. A legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute.

*Landgraf*, 511 U.S. at 285-86. The Ninth Circuit has cited this exact passage in declining to find statutes or changes to statutes to be retroactive. In *Hulteen v. AT&T Corp.*, 441 F.3d 653, 658 (9th Cir. 2006) it held

> After *Landgraf* the rules are unambiguous: in the absence of a clear expression of intent by Congress that a particular legislative enactment is to apply to events that occurred before the effective date of the legislation, the default rule is *no retroactive application*: "prospectivity remains the appropriate default rule."

(emphasis in original). Likewise, in *Scott v. Boos*, 215 F.3d 940, 948-49 (9th Cir. 2000), it was the express intent of Congress to stop certain civil RICO actions involving claims of security fraud. Nonetheless, the Ninth Circuit rejected applying the new rule to events before the statute's passage, rejecting the argument

13

"Congress must have intended to apply the statute retroactively because if not applied retroactively, the statute would not halt the perceived abuses of RICO it was designed to redress." *Id*. at 948 (internal citation omitted). It continued,

> The problem with this argument, once again, is that it does not reveal clear congressional intent; **it does not show that Congress considered the options and decided to apply the amendment retroactively**. The *Landgraf* court explained that even where "retroactive application of a  new statute would vindicate its purpose more fully this is not a sufficient reason to rebut the presumption against retroactivity." Thus, even if Congress may have wanted the RICO amendment to apply retroactively, we cannot do so absent clear congressional intent.

*Scott*, 215 F.3d at 948-49 (internal citation and alteration omitted and emphasis added).

Here there simply is no such "clear expression of intent by Congress that a particular legislative enactment is to apply to events that occurred before the effective date of the legislation" because § 754 does not mention state law or preemption, much less retroactive preemption of state law. Nor does the Congressional Research Service's bill summary contain any mention of preemption or retroactivity, because there is no "expression of intent" of the law to be retroactive, clear or otherwise. That CRS summary of § 754, in its entirety, reads:

> (Sec. 754) Prohibits the FDA from deeming partially hydrogenated oils to be unsafe or any food containing a partially hydrogenated oil to be adulterated prior to June 18, 2018.[5]

ConAgra contends Plaintiff's "use" claims are conflict preempted because they directly contradict the FDA's 2015 Final Determination and the CAA. Mot. at 9. This would require a finding of retroactive effect, as almost all of Plaintiff's purchases occurred prior to the passage of the CAA. ConAgra has failed to show that state law claims accrued prior to the CAA's passage are now barred by the subsequent legislation. Moreover, the fact the law has a *sunset date* in 2018 is not a clear expression of intent that it applies to conduct many years before its passage. Rather, the most natural reading is that § 754 applies starting with the date of its passage and ending with its sunset date.

## IX.   <u>PLAINTIFF HAS STATUTORY STANDING FOR HIS ADVERTISING CLAIMS.</u>

ConAgra's contention that Plaintiff lacks statutory standing to assert his false advertising claims lacks merit. Defendant employs a twisted reading of Plaintiff's complaint to argue that Mr. Beasley could

---

[5] *Available at* https://www.congress.gov/bill/114th-congress/house-bill/2029.

14

not possibly adequately plead reliance on the "0g Trans Fat" statement because "Plaintiff did not know about the purported dangers of trans fat when he purchased the products." Mot. at 16-17.

A few months ago the Ninth Circuit explicitly rejected this argument. Indeed, that case also involved a plaintiff challenging (1) the illegal/unfair use of trans fat and (2) a false/deceptive/unauthorized "0g trans fat" nutrient content claim. *Hawkins v. Kroger Co.*, 906 F. 3d 763 (9th Cir. 2018). The *Hawkins* plaintiff "allege[d] that she relied upon the label and would not have bought the product without the misrepresentation." *Id.* at 768-69. The court went on to find:

> In holding that Hawkins did not plead reliance, the district court misread Hawkins's complaint. It interpreted the complaint as alleging that she did not read the "0g Trans Fat per serving" product label until August 2015, fifteen years after she began purchasing the product. However, the paragraph cited by the district court to support its conclusion reads, "Plaintiff first discovered Defendant's unlawful acts described herein in August 2015, when *she learned that Kroger Bread Crumbs contained artificial trans fat . . . .*" Compl. ¶ 74 (emphases added). This paragraph does not allege that she first read the label in August 2015; it alleges she first discovered the label was misleading on that date. The district court did not address the three paragraphs where Hawkins concretely alleged that she relied on the label.

*Id.* at 769. Here, ConAgra asks the Court to engage in this exact "misread[ing]" of Plaintiff's allegations. Mr. Beasley specifically alleges he "relied on ConAgra's '0g Trans Fat' claim as a substantial factor in some of his purchases of Crunch 'n Munch." FAC ¶ 64. Plaintiff further alleges he "suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising: he was denied the benefit of the bargain when he decided to purchase Crunch 'n Munch. Had Plaintiff been aware of Defendant's false and misleading advertising tactics, he would not have purchased Crunch 'n Munch." FAC ¶ 123. Plaintiff's FAC states he "first discovered ConAgra's unlawful acts around October 2018." FAC ¶ 62. It "does not allege that [he] first read the label in [October 2018]; it alleges [he] first discovered the label was misleading on that date." *Hawkins*, 906 F.3d at 769.

Because Beasley has "adequately alleged that [he] relied on the label's misrepresentations and would not have purchased the product without those misrepresentations, [he] has adequately alleged standing for [his] labeling claim[s]." *Hawkins*, 906 F.3d at 769.

## X.    NO SAFE HARBOR PROTECTS CONAGRA.

Defendant's argument that "the FDA's 2015 Final Determination and the CAA create a safe

15

harbor by expressly authorizing PHO usage throughout the class period," Mot. at 10, lacks merit.  "A safe harbor exists *only* where conduct is *expressly permitted*, not merely because conduct is not expressly prohibited." *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1099 (N.D. Cal. 2010). The safe harbor rule only prevents Mr. Beasley from "'plead[ing] around' an 'absolute bar to relief.'" *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 720 (2001) (citation omitted). ConAgra claims that the FDA's Final Determination and § 754 explicitly permit the use of trans fat in food. As discussed above, this is incorrect. In fact, the Final Determination declared PHOs unsafe for use in food and set a 2018 date for the FDA to begin enforcement. A federal agency vested with prosecutorial power's statement about when it plans to begin enforcement of a federal statute in the future says nothing about the content of federal law, much less state law. And ConAgra has provided no citation to a federal enforcement policy for a federal statute somehow providing a safe harbor for the private enforcement of a state law.

Further, because the FDA explicitly declared "state or local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with federal law, or to frustrate federal objectives[,]" 80 Fed. Reg. at 34655, the FDA's Final Determination provides Defendant no safe harbor – rather, it expressly finds state and local laws regulating trans fat are not in conflict. **"The FDA's prior declination to issue a regulation pertaining to all artificial trans-fats did not establish a safe harbor protecting use of that ingredient from the reach of California law."** *Guttmann v. Nissin Foods (U.S.A.) Co.*, 2015 U.S. Dist. LEXIS 92756, at \*11-12 (N.D. Cal. July 15, 2015) (emphasis added). *See also, Jordan*, 745 F. Supp. 2d at 1099.

Moreover, as alleged in Plaintiff's FAC and discussed in detail above, the sale of Crunch 'n Munch containing trans fat violated 21 U.S.C. §§ 342 and 348 and Cal. Health & Saf. Code §§ 110395, 110398, 110440, 110670, 110680, 110760, 110765, and 110770. FAC ¶¶ 104-110.

## XI.    DEFENDANT'S ARGUMENT THAT A CONSUMER FRAUD PLAINTIFF CANNOT PLEAD UCL, CLRA, AND FAL CLAIMS TOGETHER IS CONTRARY TO OPINIONS OF THE NINTH CIRCUIT AND CALIFORNIA SUPREME COURT.

ConAgra's contention that "Plaintiff's equitable UCL and FAL claims . . . fail because they duplicate legal claims asserting an adequate legal remedy," Mot. at 13-14, is unavailing. This argument "runs afoul of the widely accepted principle that" Plaintiff is the "master of his own complaint." *Thomas*

16

*F. White 1991 Tr. v. Connell*, 2017 U.S. Dist. LEXIS 131828, at *4-5 (N.D. Cal. Aug. 16, 2017). As such, Plaintiff may "plead in the alternative." *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1042 (N.D. Cal. 2018).

Further, ConAgra's argument is contrary to opinions of the Ninth Circuit and the California Supreme court, both of which have routinely allowed such "duplicate" claims to proceed. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) ("[R]estitution is available on a classwide basis once the class representative makes the threshold showing of liability under the UCL and FAL."); *Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103, 1112, 1116 (9th Cir. 2017) (reversing order dismissing "UCL, CLRA, and FAL claims"); *Solus Indus. Innovations, LLC v. Superior Court*, 4 Cal. 5th 316, 347 (2018) (reversing order dismissing the "UCL and FAL claims asserted in this action"). Similarly, ConAgra's argument that Plaintiff may not simultaneously assert his UCL, FAL, and warranty claims, Mot. at 13-14, is also contrary to controlling authority. The Ninth Circuit and California courts consistently allow such claims to proceed simultaneously. For example, in *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989 (9th Cir. 2018), the Court of Appeals "reverse[d] the district court's judgment in favor of [defendant] as to the UCL and CLRA claims, as well as the breach of express warranty claim that relie[d] on the same evidence." *Id.* at 993-94.

Finally, ConAgra's argument is contrary to the text of the UCL, which states "the remedies or penalties provided by this chapter **are cumulative to each other and to the remedies or penalties available under all other laws** of this state." Cal. Bus. & Prof. Code § 17205 (emphasis added). *See De La Torre v. CashCall, Inc*., 5 Cal. 5th 966, 980 (2018) (plaintiffs seek "UCL remedies—restitution and injunctive relief—which are recoverable 'cumulative' of any other remedies.").

## XII.   PLAINTIFF PLAUSIBLY PLEADS TIMELY CLAIMS.

ConAgra's contention that "Plaintiff has not plausibly asserted timely claims," Mot. at 18, stems from a misreading of Beasley's FAC. ConAgra argues that "Plaintiff must assert facts threading the needle between the statutory time-bar and the product's non-PHO reformulation." Mot. at 18-19.

In Plaintiff's FAC, "references to Crunch 'n Munch only include Crunch 'n Munch during the period it contained PHO" "[u]nless otherwise stated." FAC ¶ 4. *See also* FAC ¶ 94 (limiting the proposed class and subclass to purchasers of "Crunch 'n Munch products containing partially hydrogenated oil"

17

and purchasers of "Crunch 'n Munch containing the nutrient content claim '0g Trans Fat' that contained added trans fat"). Thus, Plaintiff's allegation that he "regularly purchased Crunch 'n Munch during the Class Period," FAC ¶ 60, means Plaintiff purchased the product "during the period it contained PHO." FAC ¶ 4. ConAgra's argument that the FAC "require[s] the Court and Conagra to impermissibly speculate whether any of Plaintiff's purchases occurred during an actionable temporal period," Mot. at 19, therefore fails. Again, Plaintiff alleges he "regularly purchased Crunch 'n Munch during the Class Period" and the definition of both the Class Period and Crunch 'n Munch are limited to the 2010 to mid-2018 period when the product contained PHO and the false "0g trans fat" claim. FAC ¶¶ 4, 60, 94.

ConAgra separately asks the Court to dismiss on the grounds of statute of limitations because Plaintiff's claims "dating back to 2010" are time-barred and must be dismissed. Mot. at 19. They are not. Regardless, "[s]tatute of limitations . . . is an affirmative defense that a plaintiff has no obligation to plead around in his or her complaint." *Sloan v. GM, LLC*, 287 F.Supp. 3d 840, 886 (N.D. Cal. 2018) (quoting *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 961 (N.D. Cal. 2014)). As such, "the party pleading must establish, *on the trial*, the facts showing that the cause of action is so barred." Cal. Code Civ. Proc. § 458 (emphasis added).

A motion to dismiss based on statute of limitations "can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Roches v. Cty. of Santa Clara*, 2018 U.S. Dist. LEXIS 114756, at *8 (N.D. Cal. July 9, 2018). This is rarely happens, "unless the complaint alleges every fact which the defendant would be required to prove if he were to plead the bar of the applicable statute of limitation as an affirmative defense." *Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 223 (2010).

Moreover, while the FAC did not need to allege tolling because statute of limitations is an affirmative defense, the FAC nonetheless does so. "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988). "A plaintiff's inability to discover a cause of action may occur 'when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand.'" *NBCUniversal Media, LLC v.*

18

*Superior Court*, 225 Cal. App. 4th 1222, 1232 (2014) (quoting *Shivey v. Bozanich*, 31 Cal. 4th 1230, 1248 (2003)).

Here, Mr. Beasley did not "discover that Defendant's behavior was unfair and unlawful and ConAgra's labeling was false, deceptive or misleading until around October 2018, when he learned that Crunch 'n Munch contained trans fat despite its explicit label claim." FAC ¶ 91. He also alleges he is a "reasonably diligent consumer who exercised reasonable diligence" and "ConAgra's labeling practices—in particular, falsely representing for many years that Crunch 'n Munch has '0g Trans Fat'—actively impeded Plaintiff's and Class members' abilities to discover [their] claims." FAC ¶ 92.

Finally, ConAgra's argument that Plaintiff or his proposed class's claims are barred by the statute of limitations is "unripe at this stage of the litigation." *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1159 (C.D. Cal. 2012). The temporal scope of a proposed class is not a question of stating a claim, but a question of typicality, and assessed after discovery on the class certification motion. *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 476 (C.D. Cal. 2012).

## XIII.   PLAINTIFF ADEQUATELY ALLEGES BREACH OF IMPLIED WARRANTY.

The implied warranty of merchantability requires that goods "[a]re fit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(c); Cal. Civ. Code § 1791.1. Plaintiff alleges "Crunch 'n Munch contained an unsafe food additive," FAC ¶ 62, and was thus "not fit for its ordinary purpose and did not conform to the representations on its labels." FAC ¶ 114. Cal. Com. Code § 2316, Comment 8 provides that "[t]he particular buyer's skill and the normal method of examining goods in the circumstances determine what defects are excluded by the examination," and "a nonprofessional buyer will be held to have assumed the risk *only for such defects as a layman might be expected to observe*." *Id.* (emphasis added). "Nor can latent defects be excluded by a simple examination." *Id.*

Here, ConAgra acknowledges that "[i]n food cases, a party can plead a product violated the implied warranty of merchantability by alleging, for example, the product is not safe for consumption, or that the product was contaminated or contained foreign objects." Mot. at 12-13. That is exactly what Beasley has done here. Plaintiff alleges he "bought Crunch 'n Munch manufactured, advertised, and sold by" ConAgra, FAC ¶ 112, that he "repeatedly consumed Crunch 'n Munch," FAC ¶ 86, and that Crunch

'n Munch was not fit for its ordinary purpose due to its PHO content, which causes a myriad of ailments. FAC ¶¶ 18-54.

ConAgra next argues "a plaintiff alleging a breach of implied warranty claim [must] be in vertical privity with the defendant." Mot. at 13. This argument fails because "California courts have recognized an exception to the privity requirement in cases involving foodstuff." *Tapia v. Davol, Inc.*, 116 F. Supp. 3d 1149, 1159 (S.D. Cal. 2015) (following and quoting *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695 (1954). *See also Jones v. ConocoPhillips Co.*, 198 Cal. App. 4th 1187, 1201 (2011) (exception to the privity "in cases involving foodstuffs.").

Moreover, "the determination of whether something constitutes a latent defect is a factual determination" that cannot be decided at this stage of the pleadings. *United States v. Lembke Constr. Co.*, 786 F.2d 1386, 1387 (9th Cir. 1986) (citation omitted). *See also Skeen v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 9256, at *48 (D.N.J. 2014) ("whether there is a latent defect and whether it amounts to a breach of implied warranty are questions of fact for the jury"); *Kraft Reins. Ir., Ltd. v. Pallets Acquisitions, LLC*, 845 F. Supp. 2d 1342, 1356-57 (N.D. Ga. 2011) (same).

ConAgra does not dispute that the elements of a breach of the implied warranty of merchantability have been properly pleaded. Mot. at 13.

## XIV.    PLAINTIFF'S COMPLAINT COMPLIES WITH RULE 9(B).

ConAgra argues that "Plaintiff fails to satisfy that rule because he fails to allege the basic facts surrounding his alleged purchases." Mot. at 17. Defendant conveniently ignores Plaintiff's well-pleaded allegations in raising this contention. As ConAgra acknowledges, "[t]o satisfy Rule 9(b), Plaintiff must allege with particularity the 'who, what, when, where, and how of the misconduct.'" Mot. at 17 (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). Plaintiff has done just that.

Plaintiff alleges that "Crunch 'n Munch was placed into interstate commerce by ConAgra, and sold throughout the country and California with ConAgra's knowledge it contained a unlawful, unfair, and deceptive nutrient content claim, and an unlawful and unfair ingredient." FAC ¶ 59. Beasley "regularly purchased Crunch 'n Munch during the Class Period." FAC ¶ 60. *See also* FAC ¶ 12. Further, Beasley alleges he "purchased Crunch 'n Munch from San Francisco and San Mateo grocery stores." FAC ¶ 61. Beasley "relied on ConAgra's '0g Trans Fat' claim as a substantial factor in some of his

20

purchases of Crunch 'n Munch." FAC ¶ 64. Thus, Plaintiff has alleged with particularity the "who, what, when, where, and how of the misconduct." *Kearns*, 567 F.3d at 1124 (quotations omitted).

ConAgra contends "Plaintiff's failure to specify when during this eight-year period he purchased Crunch 'n Munch® is particularly problematic because . . . Crunch 'n Munch® no longer contains PHO," and "If Plaintiff's purchases took place after PHO was discontinued, his claims would be factually impossible by his own admission." Mot. at 17-18. As discussed above, Beasley's FAC expressly only deals with Crunch 'n Munch during the time it used trans fat and while falsely claiming "0g trans fat." FAC ¶ 4, 94. Indeed, the proposed class period ends in mid-2018, which appears to be when the practice was discontinued. FAC ¶ 94. During this time, Beasley states he purchased the product "regularly." FAC ¶ 60.

## XV.  PRIMARY JURISDICTION ABSTENTION, AN UNUSUAL DOCTRINE TO BE "INVOKED SPARINGLY," DOES NOT APPLY TO PLAINTIFF'S STATE-LAW CONSUMER PROTECTION CLAIMS.

In *Reid v. Johnson & Johnson*, 780 F.3d 952, 966-67 (9th Cir. 2015), the Ninth Circuit found primary jurisdiction did not apply in a class action alleging a margarine company was unlawfully using trans fat and labeling it "No Trans Fat." As with ConAgra's preemption arguments, it fails to mention this controlling and contrary authority. *See also Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124 (N.D. Cal. 2010) (rejecting primary jurisdiction in class action involving trans fat in food); *Delacruz v. Cytosport, Inc.*, 2012 U.S. Dist. LEXIS 90847, at *18-22 (N.D. Cal. June 28, 2012) (same).

The primary jurisdiction doctrine "'is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit.'" *Reid*, 780 F.3d at 966 (quoting *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir. 2008)). The doctrine "applies in limited circumstances," and is invoked only when a claim that is cognizable in federal court "*requires* resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Reid*, 780 F.3d at 966 (emphasis added). The intent of a primary jurisdiction dismissal is "to allow the plaintiff to pursue administrative remedies." *Clark*, 523 F.3d at 1115 n.9 (emphasis added). Here, there is no administrative remedy for Mr. Beasley to pursue. The FDA

has already decided to declare PHOs unsafe and unfit for use in food. He is content with current California and federal law. The relief he seeks is restitution for ConAgra's prior violations of state and federal law.

Aside from this simply not being the type of case where primary jurisdiction might apply, it fails to meet the standard. It is to be used only where there is (1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration. *Davel Communs. v. Qwest Corp.*, 460 F.3d 1075, 1086-87 (9th Cir. 2006). Where "allegations of the complaint do not necessarily require the doctrine's applicability, then the primary jurisdiction doctrine may not be applied on a motion to dismiss." *Id*. at 1088.

### A.    No Complex Scientific Issue or Question of First Impression Exists, and Theoretical Food Additive Petitions Do Not Necessitate Primary Jurisdiction Abstention.

Primary jurisdiction is inappropriate because ConAgra "has failed to demonstrate that Plaintiff's claims under California law require the FDA's scientific or technical expertise." *Delacruz*, 2012 U.S. Dist. LEXIS 90847 at *28. The "issues raised by Plaintiff's claims, particularly its state law . . . . claims, do not clearly require the FDA's expertise or benefit from uniformity in administration." *Sciortino v. PepsiCo, Inc.*, 108 F. Supp. 3d 780, 814 (N.D. Cal. 2015) (citing *Reid,* 780 F.3d at 967).

ConAgra argument that case for primary jurisdiction abstention is "particularly strong here" because a theoretical "petition could result in further extensions or guidance that could be undermined by inconsistent judicial rulings adjudicating state claims," Mot. at 25, is meritless.

Firstly, even if the promise of a future-filed petition[6] could validly serve to divest this Court of jurisdiction over currently active litigation, the odds of success of such petition is approximately zero. The FDA stated in its Final Determination that the agency considered "available scientific evidence" and found:

> both controlled feeding trials and prospective observational studies published on trans fat consumption have consistently confirmed the adverse health effects of trans fat consumption on

---

[6] As of February 12, 2019, the FDA is not reviewing any Food Additive Petitions relating to the use of PHO. *See* https://www.accessdata.fda.gov/scripts/fdcc/index.cfm?set=FAP-CAP.

*Beasley v. ConAgra Brands, Inc.,* Case No: 3:18-cv-06730-SI
OPPOSITION TO MOTION TO DISMISS

risk factor biomarkers (e.g., serum lipoproteins including LDL-C) and increased risk of [coronary heart disease ("CHD")] (78 FR 67169 at 67172). . . . . a variety of different kinds of studies and review articles show[] that, in addition to an increased risk of CHD, trans fat consumption (and, accordingly, consumption of food products containing PHOs) has also been connected to a number of other adverse health effects. These effects included worsening insulin resistance, increasing diabetes risk, and adverse effects on fetuses and breastfeeding infants, such as impaired growth.

80 Fed. Reg. at 34659 (internal citations omitted).

The suggestion that a petition might be filed for the approval of a special use of PHO, and that petition might include new data, and that new data might not only persuade the FDA but wholly overturn the scientific consensus that PHO is unsafe for human consumption, is layering speculation on top of supposition on top of hearsay on top of wishful thinking. GRAS status requires *a consensus of scientific experts* to believe the food additive is safe.

## B.   Dismissal Would Allow the Statute of Limitations to Run.

Even if primary jurisdiction were potentially applicable, it still should not be applied because dismissal would unfairly disadvantage Mr. Beasley and the members of the class he seeks to represent. *See Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (even if primary jurisdiction might apply, courts have "discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice."). Here, primary jurisdiction would cause "unfair disadvantage" to occur because the statute of limitations would run during the pendency of the primary jurisdiction referral. *See Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1173 (9th Cir. 2002) (reversing the district court's primary jurisdiction dismissal on a number of grounds and further finding, even if primary jurisdiction were applicable, dismissal without prejudice would create an unfair disadvantage because of the statute of limitations).

## XVI.   A STAY PENDING *MCGEE* IS UNWARRANTED.

Regarding ConAgra's advocacy for a stay pending the Ninth Circuit's opinion in *McGee v. S-L Snacks National, LLC*, this is of course a matter entirely within the Court's discretion, and Plaintiff cannot gainsay ConAgra's argument that judicial efficiency would be served to some extent by a stay that sees if the Ninth Circuit resolves the single major issue it declined to address in *Hawkins*: preemption of trans fat "use claims."

However, the Ninth Circuit's opinion in *Hawkins* means that claims involving the labeling of Crunch 'n Munch will go forward. The preemption issue that *Hawkins* remanded to the district court rather than resolve on the first instance involved only an alternative theory for the same *corpus* in dispute: the money paid by class members for Crunch 'n Munch. At most, the Ninth Circuit will merely decide if Plaintiff may present his alternative "use claim" theory at summary judgment or trial.

**XVII.   PLAINTIFF COMPLIES WITH THE CLRA.**

ConAgra's contention that Plaintiff "failed to file and provide sufficient statutory notice" of his CLRA claim "before filing his original complaint," Mot. at 23 n.13, is unavailing. Plaintiff was "not required to provide notice before filing the original . . . complaint[] because [he] did not seek damages under the CLRA in [that] complaint[]." *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1260 (2009). "Thus, as stated in Civil Code section 1782, subdivision (d), no notice was required. Moreover, that statute contemplates that a consumer may amend a complaint for injunctive relief to add a request for damages under the CLRA." *Id.* Indeed, the statute expressly allows such an amendment, as long as it is 30 days or more after filing of the original complaint and compliance with the notice requirement." *Id. See also Hunt v. Sunny Delight Bevs. Co.*, 2018 U.S. Dist. LEXIS 146612, at *11 (C.D. Cal. Aug. 23, 2018) (same). Here, ConAgra received Plaintiff's notice on November 9, 2018, and Plaintiff filed his FAC on January 11, 2019, "well after the expiration of the thirty-day notice period," thus Plaintiff's "request for damages under the CLRA is not procedurally improper." *Hunt*, 2018 U.S. Dist. LEXIS 146612, at *11.

ConAgra further contends Beasley's CLRA claim is deficient because he "failed to file the requisite declaration of venue." Mot. at 23 n. 13. But the CLRA's "venue-affidavit requirement is a state procedural rule inapplicable in federal court because 'application of the requirement does not have a significant impact on the outcome of the case.'" *Evans v. Linden Research, Inc.*, 763 F. Supp. 2d 735, 738 n.1 (E.D. Pa. 2011); *see also Sandoval v. PharmaCare US, Inc.*, 145 F. Supp. 3d 986, 999 (S.D. Cal. 2015); *Lara v. LG Elecs. U.S.A., Inc.*, 2018 U.S. Dist. LEXIS 132583, at *15 (D. Minn. Aug. 7, 2018). *Accord*, *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) ("Questions of venue" are "essentially procedural") (following *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994) ("venue is a matter that goes to process rather than substantive rights").

24

## XVIII.    CONCLUSION

The Court should deny ConAgra's motion in its entirety. Should the Court find Plaintiff's FAC deficient in any way, Beasley respectfully requests leave to amend.

DATED: February 15, 2019                              Respectfully Submitted,


/s/ Gregory S. Weston
**THE WESTON FIRM**
GREGORY S. WESTON
ANDREW C. HAMILTON
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:    (619) 798-2006
Facsimile:    (619) 343-2789

**Counsel for Plaintiff**

*Beasley v. ConAgra Brands, Inc.,* Case No: 3:18-cv-06730-SI
OPPOSITION TO MOTION TO DISMISS